# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| Brigitte M. Coles, | Case No. 1:19-cv-534 |
| Plaintiff, |  |
| -vs- | JUDGE PAMELA A. BARKER |
| Johnny Appleseed Broadcasting Company, et al., | MEMORANDUM OPINION AND ORDER |
| Defendants |  |

Currently pending is the Motion for Summary Judgment filed by Defendants Johnny Appleseed Broadcasting Company and Robert Meisse.  (Doc. No. 23.)  Plaintiff Brigitte Coles filed a Brief in Opposition, to which Defendants replied.  (Doc. Nos. 28, 31.)  For the following reasons, Defendants' Motion for Summary Judgment (Doc. No. 23) is GRANTED.

## I.    Procedural Background

On March 11, 2019, Plaintiff Brigitte M. Coles (hereinafter "Plaintiff" or "Coles") filed a Complaint in this Court against Defendants (1) Johnny Appleseed Broadcasting Company, d/b/a Mid-State Multimedia Group, d/b/a Mid-State Television, Inc., d/b/a WMFD TV Mansfield; and (2) Robert Meisse (hereinafter referred to collectively "Defendants" or "WMFD").  Therein, Plaintiff asserts claims of race discrimination, disability discrimination, and retaliation arising out of her employment with Defendants as a news anchor/reporter.

Specifically, in Count One, Plaintiff asserts claims under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA") for failure to provide a reasonable accommodation, retaliation for requesting a reasonable accommodation, and discrimination based on her disability.

(Doc. No. 1 at ¶¶ 67-69.)  In Count Two, Plaintiff asserts state law claims under Ohio Rev. Code § 4112.01, *et. seq* for failure to provide a reasonable accommodation, retaliation for requesting a reasonable accommodation, discrimination based on disability, and race discrimination.  (*Id.* at ¶¶ 75-80.)  Finally, in Count Three, Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* for race discrimination and retaliation.[1]  (*Id.* at ¶¶ 85-95.)  Plaintiff seeks declaratory and injunctive relief, as well compensatory and punitive damages and reasonable attorney fees and costs.  (*Id.* at pp. 14-15.)

Plaintiff stipulated to the dismissal with prejudice of Counts One and Three with respect to Defendant Meisse on April 2, 2019, which then-assigned District Judge James Gwin approved on April 8, 2019.  (Doc. Nos. 5, 10.)

Defendants filed an Answer on April 10, 2019.  A Case Management Conference ("CMC") was conducted shortly thereafter, at which time various initial case management deadlines were set.  (Doc. No. 16.)  This matter was re-assigned to the undersigned on June 28, 2019 pursuant to General Order 2019-13.

On January 13, 2020, Defendants filed a Motion for Summary Judgment with respect to all of Plaintiff's claims.  (Doc. No. 23.)  Plaintiff filed a Brief in Opposition on February 24, 2020, to which Defendants replied on March 20, 2020.  (Doc. Nos. 28, 31.)  Defendants' Motion is now ripe and ready for resolution.

---

[1] In this Count, Plaintiff also purports to assert a claim under Title VII for "failure to provide a reasonable accommodation of her disability."  (*Id.* at ¶ 91.)  This claim, however, is more properly asserted under the ADA.

## II.     Facts

### A.     Plaintiff is hired as an anchor/reporter

Defendant Johnny Appleseed Broadcasting Company is an independently owned news media organization which delivers programming through radio channels and a television station, WMFD-TV.  (Meisse Aff. (Doc. No. 23-1) at ¶ 3.)  WMFD-TV focuses on local newscasts and programming and posts material on its website, including news, sports, and weather updates.  (*Id*. at ¶ 4.)  Defendant Robert Meisse is the General Manager and President of Johnny Appleseed and oversees its staff and operations.  (*Id*. at ¶ 2a.)

Defendants hired Plaintiff as an anchor/reporter on April 7, 2004.  (*Id*. at ¶ 5.)  At that time, Plaintiff had two years' worth of previous broadcasting experience.[2]  (Coles Depo. (Doc. No. 24-1) at Tr. 149-154.) She did not have a college degree.  (*Id.* at Tr. 148-150.)  Plaintiff's job responsibilities as an anchor/reporter included the following:

- Gathering, writing, and producing news;

- Anchoring morning, midday, and evening newscasts and reporting on-air, including filling in on weather as needed;

- Writing, producing, and providing voiceovers for programming;

- Pulling and editing stories from a national database and posting these stories on WMFD's website; and

- Hosting and coordinating two weekly local affairs programs, "Focus on North Central Ohio" and "Inside Mansfield City Schools."

(*See* Meisse Aff. at ¶¶ 5a-5b; Coles Depo. at Tr. 154-161.)

---

[2] Plaintiff testified that her broadcasting experience had been obtained between 1996 and 1998, six years prior to starting at WMFD. (Coles Depo. at Tr. 152-154.)

3

When she was hired in April 2004, Plaintiff was paid $9.62 per hour, or $20,000 per year. (Meisse Aff. at ¶ 5c.)  Several months later, in July 2004, Meisse approached Plaintiff asking if she "wanted" the newly vacant News Director position, a promotion that would have included an improved title and a raise.  (Coles Depo. at Tr. 167.)  Plaintiff declined because she felt she lacked the experience to run the newsroom.  (*Id.* at Tr. 168.)  *See also* Meisse Aff. at ¶ 8a.

Sometime after December 31, 2009, Plaintiff, who is African-American, approached then-News Director Larry Stein to request a raise.  (Coles Depo. at Tr. 14, 16.)  Plaintiff told Stein that she noticed a difference between her pay and that of certain other employees.[3]  (*Id.* at Tr. 15.)  She also observed that she was "the only black female" working at WMFD.  (*Id.* at Tr. 16.)  According to Plaintiff, Stein responded that there was likely no money in the budget for a raise.  (*Id.* at Tr. 17.)  Plaintiff did not pursue the conversation further.  (*Id.* at Tr. 16.)

In March 2011, Plaintiff received a 10% raise to $10.58 per hour, or $22,000 per year. (Meisse Aff. at ¶ 6.)  Sometime in 2012 or 2013, Meisse again approached Plaintiff about the News Director position.  (Coles Depo. at Tr. 170.)  Plaintiff again declined.  (*Id.*)  *See also* Meisse Aff. at ¶ 8b.

In December 2015, Defendants announced a 5% raise across-the-board for employees, including Plaintiff.  (Meisse Depo. Ex. 2 (Doc. No. 28-3).)  This raise increased Plaintiff's pay to $11.10 per hour, or $23,100 per year, effective January 1, 2016.  (Meisse Aff. at ¶ 7.)

---

[3] As discussed in more detail *infra,* in her Brief in Opposition, Plaintiff identifies two former WMFD employees who were allegedly paid more than Plaintiff for performing the same job responsibilities, i.e., Megan Mahoney and Natalie Clark.  Both Mahoney and Clark are Caucasian.  Defendants hired Mahoney in 2007 to anchor broadcasts and report news and weather.  (Meisse Aff. ¶ 11.)  WMFD paid Mahoney $11.54 per hour (or $24,000 per year), from 2007 until Mahoney left WMFD in April 2009.  (*Id.*)  Defendants hired Clark in 2008 to anchor broadcasts and report news; when a weather department position opened, Clark also reported weather.  (*Id.* at ¶12; Coles Depo. at Tr. 65.)  Defendants paid Clark $10.10 per hour (or $21,000 per year), from 2008 until Clark left WMFD in March 2013.  (Meisse Aff. at ¶ 12.)  Both Mahoney and Clark hold college degrees.  (*Id.* at ¶¶ 11b, 12b.)

4

### B.    Plaintiff's Health Deteriorates

#### 1.    July 2016 through November 2016:  Plaintiff's Initial Diagnoses and Treatment

In late July 2016, Plaintiff was admitted to the hospital for observation, following a high fever and other problems.  (Coles Depo. at Tr. 182-186.)  Plaintiff texted her WMFD colleagues that she planned to return to work, but News Director Greg Heindel and Assistant News Director Jay Palmer directed her to go home and not worry about work for now.  (*Id.*)  Plaintiff testified that, although she planned to return to work, her condition deteriorated so rapidly that by the end of the week, she could barely walk.  (*Id*. at Tr. 186.)

In early August 2016, Plaintiff was diagnosed with histoplasmosis.  (*Id.* at Tr. 187.)  Her physician stated that she could not work until August 27, 2016, and that, upon her return, she should be limited to "light duty" for two weeks.  (Doc. No. 24-14.)  Plaintiff's return to work date was twice extended: first to September 6, 2016, and then to September 15, 2016.  (Doc. Nos. 24-15, 24-16.)

Plaintiff testified that, by mid-September, she had returned intermittently to the newsroom, sometimes working half-days. (Coles Depo. at Tr. 193-194.)  In late September 2016, Plaintiff's infectious disease doctor, Mark Lustberg, M.D., indicated that she should be limited to working half-days for six months; i.e. from September 2016 through March 2017.[4]  (Doc. No. 24-17.)  Plaintiff provided Defendants with this letter and Defendants agreed that she could work half-days through March 23, 2017.  (Coles Depo. at Tr. 196-197.)  By late September 2016 and early October 2016, however, Plaintiff's health had deteriorated so significantly that she was often unable to work at all, and work half-days only intermittently.  (*Id*. at Tr. 197.)

---

[4] While Dr. Lustberg's note is poorly worded, the parties appear to agree that his letter authorized her to work half-days for six months.  (Doc. No. 23 at PageID# 122; Coles Depo. at Tr. 196-197.)

It is undisputed that, throughout this entire time period, Defendants granted all of Plaintiff's requests for leave and continued to pay her full salary and benefits.  (*Id.*)  *See also* Meisse Aff. at ¶ 17.

### 2.  November 2016 through March 2017:  Plaintiff's Cancer Diagnosis, Treatment, and Surgery

In November 2016, Plaintiff was diagnosed with a malignant chest tumor.  (Coles Depo. at Tr. 199-200.)  Plaintiff never returned to work at WMFD after her cancer diagnosis.  (*Id.*)  Doctors immediately placed her on a five-week long course of radiation treatment.  (*Id.*)  In January 2017, Plaintiff underwent open-heart surgery to remove the tumor.  (*Id.*)  As a result of the surgery, Plaintiff suffered a paralyzed vocal cord, leaving her temporarily unable to speak.  (*Id.* at Tr. 203-204.)  Plaintiff then convalesced for several weeks in a rehabilitation facility, where she received occupational, physical, and speech therapy.   (Doc. No. 24-5 at PageID# 614-615.)

During this time period, Plaintiff continued to intermittently communicate with her WMFD colleagues about news stories.  For example, while undergoing radiation, Plaintiff sent at least one message to Palmer about scheduling guests for WMFD's Focus on North Central Ohio program. (Palmer Depo. (Doc. No. 28-34) at Tr. 85.)  She also sent at least two messages to Palmer with news tips. (*Id*. at Tr. 86, 88.)

On February 6, 2017, Plaintiff provided an update to WMFD regarding her ability to return to work via text message to Palmer.  (Doc. No. 24-5 at PageID# 614-617).)  In this message, Plaintiff stated as follows:

> Hey bro. I hope you had a great weekend. I'm currently in a rehab facility for speech, occupational and physical therapy.  The doctors said the surgery and radiation therapy took a lot out of me.  I have a follow-up appointment this Friday with the thoracic surgeons.  I will find out when I'm able to come back to work.  They cut through my sternum to get to the tumor.  My

6

> sternum was wired back together. They has [*sic*] also had me on the cardiologist Pulmonary Bypass machine [*sic*] during the surgery. I have so much to share with you. My voice was affected by the surgery. My left vocal cord especially. Right now I sound like a little kid. It will get better over time. I don't care about being on the air. I can write or edit stories. If you don't mind I can call you later so you can hear it. I miss you guys.

(*Id*. at PageID# 614-615.) Palmer responded that he was about to travel out of the country for a week and told Plaintiff that another reporter was managing the newsroom in his absence. (*Id*. at PageID# 616.)

### 3. March 2017 through April 2017: Defendants Terminate Plaintiff's Employment

Between November 2016 and March 2017, Defendants continued to hold Plaintiff's position and provide her with her full salary and benefits. (Coles Depo. at Tr. 201.) In early March 2017, however, Defendants sought to establish whether and when Plaintiff would return to work. (Meisse Depo. (Doc. No. 28-1) at Tr. 92.) To that end, Meisse spoke to Plaintiff's husband Sam Coles "for multiple months" and "probably somewhere near 60 days" before Plaintiff's employment was terminated at the end of April 2017. (*Id*. at Tr. 92, 108.) Meisse initially testified that he told Mr. Coles that Plaintiff's employment would be terminated if she was unable to return by April 27, 2017. (*Id*.) Meisse testified that he picked April 27, 2017 so far in advance to "try to help" Plaintiff because "[s]he was in a horrible situation." (*Id*. at Tr. 108.) He didn't "recall the exact reason" he picked April 27, 2017 but "there was a reason." (*Id*.) Later, however, Meisse testified that he "did not" set a return date of April 27, 2017 and did not, at any point, tell Mr. Coles that Plaintiff would have to return by that date or else her employment would be terminated. (*Id*. at Tr. 109-111.) Meisse further testified that he never discussed Plaintiff returning part-time with Mr. Coles. (*Id*. at Tr. 92-93.)

On March 31, 2017, Plaintiff's primary care provider, Melissa Juliano, D.O., submitted a note stating that Plaintiff was unable to return to work for an additional four weeks. (Doc. No. 28-24.)

7

Plaintiff submitted two more doctors' notes in April 2017.  The first was dated April 3, 2017 and signed by Paul Bryson, M.D.  (Doc. No. 28-25.)  Therein, Dr. Bryson stated that Plaintiff was diagnosed with a paralyzed vocal cord, which rendered her unable to speak on camera.  (*Id.*)  Dr. Bryson did not specify whether Plaintiff could return to work in any capacity.  (*Id.*)  The second note was dated April 12, 2017 and signed by Dr. Juliano. (Doc. No. 28-26.)  She stated that Plaintiff continued to rehabilitate from complex medical procedures and could not return to work until July 3, 2017 out of "medical necessity."  (*Id.*)

After receiving these notes, Defendants determined that they "could no longer hold open [Plaintiff's] position indefinitely."  (Meisse Aff. at ¶ 20.)  Defendants terminated Plaintiff's employment on April 27, 2017.  (Doc. No. 24-19.)

### 3.    EEOC Proceedings

In June 2017, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") against WMFD.  (Doc. No. 24-11.)  Plaintiff alleged that WMFD discriminated against her on the basis of race and disability.  (*Id.*)  Plaintiff did not check the "retaliation" box on the EEOC Charge of Discrimination form as a basis of discrimination.  (*Id.*)  On July 24, 2008, the EEOC determined that Plaintiff's Caucasian coworkers were "Multimedia Journalists/Anchors whose duties included more than the [Plaintiff's] duties."  (Doc. No. 24-12.)  Further, the EEOC determined that Plaintiff "was given a reasonable accommodation."  (*Id.*)  Lastly, the EEOC also determined that "growing out of the investigation, the evidence revealed Respondent's Leave of Absence policy is a strict policy that fails to allow employees to return to work unless its [*sic*] full duty," in violation of the ADA.  (Doc. No. 24-12.)

### III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

9

593 F. App'x at 508-09.  "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'"  *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.  Analysis

### A.  Failure to Accommodate

In Counts One and Two of the Complaint, Plaintiff alleges that Defendants violated the ADA and state law when they terminated her employment "because she requested a reasonable accommodation and because of the disability itself."  (Doc. No. 1 at ¶¶ 69, 77, 78, 80.)

Defendants argue that they are entitled to summary judgment in their favor because Plaintiff cannot establish a *prima facie* case for failure to accommodate.  (Doc. No. 23 at PageID# 127-131.) Defendants first maintain that they did not, in fact, deny a request for an accommodation (reasonable or otherwise) because Plaintiff's doctors clearly stated throughout 2017 that she could not return to work at all.  (*Id*. at PageID# 128.)  Defendants further assert that, even if Plaintiff had provided medical documentation in 2017 clearing her to work off-camera and from home, "that would not reflect a reasonable accommodation because such an arrangement would have precluded her from performing the essential functions of her job."  (*Id*. at PageID# 128-129.)

Defendants next argue that Plaintiff did not meet the ADA's definition of a "qualified individual" because she was unable to perform her essential job duties, which required her to be present at the station and/or on camera.  (*Id.* at PageID# 129.)  In support of this argument, Defendants assert that (1) the April 3, 2017 note from Dr. Bryson specifically stated that Plaintiff was unable to speak on camera; and (2) the April 12, 2017 note from Dr. Juliano stated that she could not return to

10

work at all.  (*Id.*)  Finally, Defendants argue that Plaintiff's claim fails because, due to the seriousness of her medical condition, the only accommodation available would have been for ongoing, indefinite leave.  (*Id.* at PageID# 130.)  Citing Sixth Circuit authority, Defendants argue that such an accommodation is unreasonable as a matter of law.  (*Id.*)

Plaintiff argues that there are several genuine issues of material fact that preclude summary judgment in Defendants' favor with respect to this claim.  (Doc. No. 28 at PageID#s 880-882.)  First, Plaintiff maintains that there is a fact issue regarding whether the April 2017 doctors' notes meant that she could not return to work in any capacity.  (*Id.*)  She argues that she requested a reasonable accommodation to work on a part-time basis from home, asserting "the evidence . . . has shown that Plaintiff's job duties included much more than her on camera work including finding, writing, editing, and producing stories."  (*Id.* at PageID# 881.)  For the same reason, Plaintiff argues that she was a "qualified individual" under the ADA; i.e., because she could still write, edit, and produce stories without appearing on camera.  (*Id.* at PageID# 881-882.)  She maintains that Defendants failed to accommodate her request when they set a termination date of April 27, 2017 without considering whether her medical documentation authorized her to return on a part-time basis.  (*Id.* at PageID# 880-881.)

Finally, Plaintiff asserts that "[t]here is clearly a dispute of fact as to the accommodation that Plaintiff was requesting." (*Id.* at PageID# 882.)  She maintains that she "had a date certain that she return full time in July 2017" and argues that she "made it clear that she could continue to perform her other job functions prior to that time."  (*Id.*)  In this regard, Plaintiff again emphasizes that Defendant Meisse, in fact, set her termination date well before receiving Dr. Bryson's and Dr. Juliano's April 2017 notes. (*Id.*)

11

In their Reply Brief, Defendants argue that Plaintiff has mischaracterized Meisse's testimony about setting her termination date.  (Doc. No. 31, PageID# 1319.)  Defendants also argue that there is no record evidence of any factual dispute over the meaning of Dr. Juliano's April 12, 2017 note and that the note is clear on its face that Plaintiff could not return to work until July 3, 2017 out of "medical necessity."  (*Id.* at PageID# 1320.)  Defendants argue again that Plaintiff failed to request a reasonable accommodation, that she was not a qualified individual under the ADA, and that the only available accommodation—indefinite leave—was unreasonable as a matter of law.  (*Id.* at PageID# 1321.)

To establish a *prima facie* case of disability discrimination for failure to accommodate, Plaintiff must demonstrate all of the following: (1) she is disabled under the ADA; (2) she is otherwise qualified for the position, with or without accommodation; (3) Defendants knew or had reason to know of her disability; (4) she requested accommodation; and (5) Defendants failed to provide the necessary accommodation.  *Myers v. Cuyahoga Cty.*, 182 F. App'x 510, 515 (6th Cir. 2006).  Here, elements two (whether Plaintiff was a "qualified individual"), four (whether she requested an accommodation), and five (whether Defendants failed to provide the requested accommodation) are at issue.

### 1.    "Otherwise Qualified Individual"

An employer discriminates under the ADA when it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A).  Under the ADA, an "otherwise qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ."  42 U.S.C. § 12112(8).

12

The Sixth Circuit has held that an employee who is unable to "meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998); *see also Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2012) ("Regular attendance is especially likely to qualify as an essential job function after this court's recent en banc holding that '[r]egular, in-person attendance is an essential function . . . of most jobs, especially the interactive ones.'") (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762-63 (6th Cir. 2015) (en banc)).  An employee who is medically unable to resume work is unable to meet the attendance requirements of her job.  *See, e.g., Gantt*, 143 F.3d at 1047 (an employee who was not released by her doctor to work, despite having been on medical leave for a year, was not an "otherwise qualified individual" because she was medically unable to meet her attendance requirements); *see also Melange v. City of Center Line*, 482 F. Appx. 81, 84 (6th Cir. 2012).

For the following reasons, the Court agrees with Defendants that Plaintiff's failure to accommodate claim fails because she cannot establish that she was an "otherwise qualified individual" under the ADA.  Plaintiff admitted in deposition that virtually all of her anchor/reporter duties required her to at least work from the station, if not also appear on camera.  (Coles Depo. at Tr. 160-161.)  She testified as follows:

> Q:    Okay. Is there anything else that make up the important duties of your job as of 2016 other than what you've told me here?
>
> A:    That's all.
>
> Q:    So a lot of it, if I understand, is the morning newscast, midday, evening. That's all on-camera work, right?
>
> A:    For that, yes.

Q:    Voiceovers, is that something you'd consider on-camera work?

A:    No. That would be behind the scenes where you would read the scripts and make sure that they would have a voice over whatever video was there in case you did not appear on camera.

Q:    Is that something that can be done remotely or do you have to be at the station to do voiceovers?

A:    You had to be at the station to do that, to record.

Q:    Not something you can do from home or some other place?

A:    No, not that.

Q:    "Focus on North Central Ohio" and the Mansfield city school special, that's all on-camera work, right?

A:    Yes, sir, those are all on camera.

Q:    Okay. When you talk about pulling stories to edit and put online, is that work you could do completely remotely?

A:    No. Those were national stories that were pulled from a program called—it's CNN, and they would load up stories all across the country from different news outlets and we could pull stories off and put them together.

Q:    Do you have to be at the station to do that?

A:    Yes, you have to be at the station to do that.

Q:    So as of 2016 it sounds like the bulk, or perhaps virtually all of your duties, were either on-camera duties that had to be done at the station, correct?

A:    Yes, sir.

(Coles Depo. at Tr. 160-161.) Yet Plaintiff stopped coming to work in November 2016 and was not medically cleared to resume work in any capacity as of April 2017. (*Id*. at Tr. 205-208.) Instead, Dr. Juliano twice extended the amount of time Plaintiff needed to remain off work in order to recover, and Dr. Bryson did not indicate how long Plaintiff may need to recover from her paralyzed vocal

14

cord. (Doc. Nos. 28-24, 28-25, 28-26.) Under these circumstances, the Court finds that Plaintiff cannot demonstrate that she was able to meet the attendance requirements of her job—no matter how earnestly she wished to return.[5] *See Gantt*, 143 F.3d at 1047; *Melange*, 482 Fed. App'x at 84. Therefore, she cannot be considered an "otherwise qualified individual" and her *prima facie* case fails.

Relying on *Keith v. County of Oakland,* 703 F.3d 918, 925-26 (6th Cir. 2013), Plaintiff argues that whether she could perform the essential functions of her job is a question for the jury. (Doc. No. 28 at PageID #882.) *Keith* is distinguishable from the instant case because *Keith* addresses whether a job function is essential, not whether the plaintiff could *perform* the essential job function. In *Keith*, the plaintiff, who was deaf, alleged that the county discriminated against him under the ADA after the county failed to hire him as a lifeguard. *Keith*, 703 F.3d at 918. In determining whether Keith was "otherwise qualified" for the lifeguard role, the court examined whether certain job duties were essential to the lifeguarding role. *Id.* at 925. In the instant case, unlike in *Keith*, there is no question about whether certain anchor/reporter job functions were essential to Plaintiff's position. Plaintiff herself identified the essential job functions and admitted that she needed to at least be present in the studio, if not also on camera, to perform them. (Coles Depo. at Tr. 160-161.) Plaintiff cites no evidence that she was medically able to perform these functions.

---

[5] Plaintiff's personal assurances that she could perform the work do not transform her into an "otherwise qualified individual" either. In *Boback v. General Motors Corp.*, a disabled employee failed to identify any modification to assembly-line jobs that would allow him to perform the work but insisted that he could perform them. 107 F.3d 870 (Table), 1997 WL 3613 (6th Cir. 1997) (unpublished disposition). The Sixth Circuit concluded that the employee failed to establish that he was a "qualified" employee: "a plaintiff's uncorroborated belief in his physical prowess is not enough to counter affirmative evidence to the contrary." *Id.* (citing *White v. York Int'l Corp.*, 45 F.3d 357, 362-63 (10th Cir. 1995)).

Plaintiff argues, however, that her April 2017 doctors' notes are ambiguous as to whether she was medically able to return to work in some part-time capacity. [6]  (Doc. No. 28 at PageID# 880-881.)  This argument is without merit.  In her April 12, 2017 note, Dr. Juliano stated that Plaintiff continued to recover from "complex medical conditions" and "will not be able to return to work until Monday July 3rd 2017 [*sic*]" and that such an absence was "a medical necessity."  (Doc. No. 28-26.) (emphasis in original).[7]  Moreover, Dr. Bryson's April 3, 2017 note stated that Plaintiff was unable to speak on camera due to a paralyzed vocal cord, and did not include an estimate regarding when she would recover.  (Doc. No. 28-25.) The Court finds that Dr. Bryson's and Dr. Juliano's notes are not ambiguous.  On their face, neither note states Plaintiff was medically able to return to work.  *See, e.g., Gantt*, 143 F.3d at 1047.   As Defendants correctly note, they were entitled to rely on these notes. *See Mobley v. Miami Valley Hosp*., 603 F. App'x 405, 413 (6th Cir. 2015) ("[O]ur case law considers letters from physicians sufficient to notify an employer of the need to accommodate a disability.").

Accordingly, and for all the reasons set forth above, the Court finds that Plaintiff has failed to establish the second element of her *prima facie* case; i.e., that she is otherwise qualified for the position, with or without accommodation.

---

[6] Plaintiff alleges that Defendants fired her based "on the April 2017 letter from Dr. Bryson," which stated that Plaintiff sustained a paralyzed vocal cord and did not indicate when Plaintiff could return to work.  (Doc. No. 28 at PageID# 880.) However, Plaintiff's subsequent argument appears to relate to the April 12, 2017 letter from Dr. Juliano, which indicated that Plaintiff could not return to work until at least July 3 as a "medical necessity."  (Doc. No. 28-26.)  In either event, Plaintiff's argument fails because the Court finds that neither letter is ambiguous.

[7] Plaintiff points to no evidence in the record, other than an exchange with Meisse during his deposition, to suggest that there was any confusion over what Dr. Juliano meant by "medical necessity."  While Meisse was equivocal at deposition about his understanding of Dr. Juliano's March 31, 2017 letter, Meisse also testified that he went "by what's on the paper" from the doctors.  (Meisse Depo. Tr. at 122.)  The Court finds this testimony is insufficient to create a genuine issue of material fact.

16

## 2.    Request for Reasonable Accommodation

Defendants also argue that Plaintiff fails to satisfy the fourth element of her *prima facie* case; i.e., that she requested a reasonable accommodation.  (Doc. No. 23.)  When an employee alleges disability discrimination for failure to accommodate, the employee must also demonstrate that she requested an accommodation.    The employee bears the initial burden of requesting an accommodation.  *Gantt*, 143 F.3d at 1046-47; *see also Tubbs v. Formica Corp.*, 107 F. App'x 485, 488 (6th Cir. 2004) ("'A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.''") (internal citations omitted).  The Sixth Circuit has "generally given plaintiffs some flexibility in how they request an accommodation."  *Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015) (citing *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir. 2008)).  Still, the initial burden falls on the employee to request an accommodation because "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."  *Gantt*, 143 F.3d at 1046-47.  There is no "bright-line" test for determining when an employee has made a reasonable accommodation request, but at a minimum, the employee "must 'make it clear from the context that [the request] is being made in order to conform with existing medical restrictions.'"  *Tennial v. United Parcel Service*, 840 F.3d 292, 307 (6th Cir. 2016) (internal citations omitted).  If the employee fails to "identify and request" a reasonable accommodation, "the employee's claim must be dismissed."  *Johnson v. Cleveland City School Dist.*, 443 F. App'x 974, 983 (6th Cir. 2011) (citing *Tubbs*, 107 F. App'x at 488-89).

17

For the following reasons, the Court finds that Plaintiff failed to request an accommodation "to work part-time and behind the camera." (Doc. No. 28 at PageID# 881.) Plaintiff argues that her February 6, 2017 text message to Palmer "encompassed an accommodation request to return to work to complete her daily functions other than being in front of the camera." (*Id.* at PageID# 877.) This argument is based on the inclusion of the following two sentences in Plaintiff's message to Palmer: "I don't care about being on the air. I can write or edit stories." (Doc. No. 24-5 at PageID# 614-615.)

The Court finds Plaintiff's argument to be without merit. Plaintiff's message to Palmer reads as an update to a close friend from work, not an accommodation request to a supervisor.[8] Plaintiff did not identify an accommodation, ask to work part-time, or ask to rearrange her work responsibilities to allow her to perform her essential job duties off-camera and/or from home.[9] (*Id.*) Defendants are "not required to speculate as to the extent" of Plaintiff's disability or her desire for an accommodation. *Gantt*, 143 F.3d at 1046-47. While "there is no bright-line test for determining when an employee like [Plaintiff] has made such a request, 'at a minimum [s]he must make it clear from the context that [the request] is being made in order to conform with existing medical restrictions.'" *Tennial*, 840 F.3d at 307.

In *Tennial*, the plaintiff claimed that he needed use of a recording device as a reasonable accommodation to refer to conversations with supervisors. *Id.* During a conversation with a

---

[8] Palmer testified that he and Plaintiff had a "pretty great" relationship. (Palmer Depo. at Tr. 31.) He stated that they "jokingly" referred to each other as "brother/sister" during his time at the station. (*Id.*)

[9] As discussed in detail above, nearly all of Plaintiff's essential job duties took place in the studio, if not also on camera. Even when Plaintiff states that she can write or edit stories, she could only have edited stories if she was medically capable of working from the newsroom. (Palmer Depo. at Tr. 91.)

supervisor, he began recording and made a reference to "[his] ADA deal," but his supervisor objected to being recorded.  *Id.*  The plaintiff argued this constituted a request for, and denial of, a reasonable accommodation.  *Id.*  The Sixth Circuit upheld the District Court's determination that a fleeting reference to his "ADA deal" was insufficient to put the supervisor on notice.  *Id.*  The plaintiff "did not explain that the recorder would help accommodate his disability . . . ."  *Id.*  Further, "the record evidence indicated that [the supervisor] did not understand" the plaintiff to be making a request.  *Id.*

Likewise, Plaintiff's passing reference to her desire to return to work is insufficient to put Defendants on notice of an accommodation request.  In her February 2017 text message, Plaintiff did not request a part-time schedule, indicate whether she needed to work from home or the office, or explain how writing or editing stories off-camera would accommodate her disability.  (Doc. No. 24-5 at PageID# 614-615.)  Additionally, Palmer testified that he did not recall ever receiving a request from Plaintiff to return to work part-time, and that, as News Director at the time, such a request would have been initially brought to his attention.  (Palmer Depo. at Tr. 42-44.)

Accordingly, the Court finds that Plaintiff has failed to establish the fourth element of her *prima facie* case; i.e., that she requested an accommodation.[10]  Because Plaintiff cannot establish

---

[10] In Defendant Meisse's affidavit, Meisse stated that he met with Plaintiff's husband, Mr. Coles, to discuss Plaintiff's condition and potential return to work.  (Meisse Aff. at ¶ 19.)  Meisse stated that Mr. Coles "explained that although Ms. Coles had not been cleared to return by her doctor, she hoped to return some day in the future to work part-time behind the scenes."  While the Plaintiff does not argue that this qualified as an accommodation request, for clarity, the Court finds that Mr. Coles's statement that Plaintiff hoped to return part-time does not qualify as an accommodation request because it fails to meet "the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable."  *Gantt*, 143 F.3d at 1046-47.  Mr. Coles's aspirational statement that Plaintiff hoped to return to work part-time impermissibly requires Defendants to "speculate as to the extent of [Plaintiff's] disability [and Plaintiff's] need or desire for an accommodation."  Plaintiff (through Mr. Coles) did not propose a timeline, a work location, or alternative work assignments that would have allowed Plaintiff to perform her essential job functions.  (Meisse Aff. at ¶ 19a.)  Further, Plaintiff (through Mr. Coles) did not request an accommodation that "conform[ed] with existing medical restrictions."  *Tennial*, 840 F.3d at 307.  As discussed above, Dr. Juliano twice stated that Plaintiff could not return to work out of "medical necessity" and Dr. Bryson stated that Plaintiff's vocal cord paralysis rendered her unable to speak on camera without indicating a possible recovery date.  (Doc. Nos. 28-24, 28-25, 28-26.)

19

either the second or fourth prongs of her *prima facie* case, the Court finds that Defendants are entitled to summary judgment in their favor with respect to Plaintiff's failure to accommodate claim.[11]

### B.  Racial Discrimination Claims

In Counts Two and Three of the Complaint, Plaintiff alleges that Defendants discriminated against her on the basis of race by paying her less than similarly situated Caucasian employees and failing to promote her to another position because of race. (Doc. No. 1 at ¶¶ 75, 85, 89, 90.)

Defendants argue that they are entitled to summary judgment on Plaintiff's racial discrimination claims with respect to her compensation[12] because Plaintiff cannot establish a *prima facie* case that she was compensated less favorably than similarly situated non-protected employees. (Doc. No. 23 at PageID# 134.)  Defendants first argue that "none of Plaintiff's alleged pay comparators were similarly situated to her because none were 'nearly identical' in all relevant respects."  (*Id*. at PageID# 134.)  In this regard, Defendants assert that Plaintiff's comparators, Natalie Clark and Megan Mahoney,[13] "maintained different job responsibilities and/or were hired with a

---

[11] In addition to failure to accommodate, Plaintiff alleges a general claim for discrimination based on disability.  The Defendant does not expressly move for summary judgment on this claim, However, the Court notes that, in order to establish disability discrimination under the ADA, irrespective of an accommodation, a plaintiff must show (among other things) that she is "otherwise qualified for the job."  *Hart v. Ridge Tool Co.*, 544 F. Supp. 2d 634, 642 (N.D. Ohio 2008) (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1185 (6th Cir. 1996)).  Here, Plaintiff's disability discrimination claim fails because, as set forth above, Plaintiff has not demonstrated that she is "otherwise qualified" for the positions of anchor/reporter.  Accordingly, because Plaintiff "failed to set forth a prima facie case of disability discrimination," her general disability discrimination claim fails.

[12] In her Complaint, Plaintiff also alleges that Defendants failed to promote her because of her race.  To set forth a *prima facie* case of discrimination based upon a failure to promote, "a plaintiff must show: (1) that [s]he is a member of a protected class; (2) that [s]he applied and was qualified for a promotion; (3) that [s]he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions."  *Sutherland v. Michigan Dep't. of Treas.*, 344 F.3d 603, 614 (6th Cir. 2003) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000)).  Plaintiff, however, never sets forth any *prima facie* case for failure to promote.  She does not identify any promotion she qualified for, sought, and was denied, nor any similarly situated employees who received promotions that she did not.  Therefore, the Court finds this claim is subject to dismissal.

[13] Plaintiff identified several additional comparators during her deposition, including Greg Heindel, Sartaj Auika, and Kaylie Hodge.  In their summary judgment briefing, Defendants argue that Plaintiff was not similarly situated to these

different educational and/or employment background." (*Id.*) Defendants maintain that, unlike these employees, Plaintiff "had no college degree, held an anchor/reporter role, and the majority of her job responsibilities remained on camera or at the station." (*Id.* at 135.)

Defendants next argue that Plaintiff cannot establish that she was treated less favorably than her alleged comparators because, as of March 2011, Plaintiff was, in fact, better compensated than Clark. (*Id.*) Defendants further assert that Plaintiff's claim fails because Meisse approached Plaintiff about the vacant News Director position on two occasions, and "if Plaintiff wanted the higher-paying position, she could have had it." (*Id.*)

In response, Plaintiff argues that Defendants' primary justification for the disparity in pay is that both Mahoney and Clark allegedly held the position of "multimedia journalist" ("MMJ")[14] as opposed to the anchor/reporter position held by Plaintiff. (Doc. No. 28 at PageID# 885.) Plaintiff maintains that genuine issues of material fact exist as to (1) when the MMJ position came into existence at WMFD; (2) whether Mahoney and Clark were, in fact, MMJs, as that term is defined by Defendants; and (3) whether the MMJ position is sufficiently different from Plaintiff's role as anchor/reporter to justify differences in pay. (*Id.*) Plaintiff further asserts that, although Clark has a college degree, she "had far less experience than Plaintiff at the time she was hired." (*Id.*) Finally, Plaintiff argues that it is irrelevant both that her salary "caught up" to Clark's pay, and that she decided to turn down the opportunity to apply for a promotion. (*Id.* at PageID# 885-886.)

---

individuals, in addition to Mahoney and Clark. In her Brief in Opposition, Plaintiff does not address Defendants' argument that she was not similarly situated to Heindel, Auika, and Hodge. Therefore, the Court deems any such argument waived.

[14] According to Defendants, MMJs differ from anchor/reporters because MMJs operate cameras in the field and anchor/reporters do not. (Meisse Aff. at ¶ 10a.)

Defendants respond that they never asserted that either Mahoney or Clark were MMJs or that either were paid more because they were MMJs.  (Doc. No. 31 at PageID# 1327.)  To the contrary, Defendants argue that Mahoney and Clark were paid more than Plaintiff because they had college degrees and fulfilled different job duties than Plaintiff.  (*Id*.)  In addition, Defendants emphasize that Plaintiff cannot establish that she was treated less favorably than non-protected employees because she "made more money than Ms. Clark" from March 2011 forward.  (*Id*. at PageID# 1328.)  Lastly, Defendants assert that "[i]t stands to reason that if Defendants were discriminating against Plaintiff, the Company's General Manager and President would not have twice offered Plaintiff a higher paying position."  (*Id*.)

Under Title VII,[15] it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).

Here, Plaintiff relies on circumstantial evidence to allege that Defendants engaged in discrimination.  In the absence of direct evidence, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  *See Kroger*, 319 F.3d at 865-66. Under this framework, "the plaintiff faces the initial burden of presenting a *prima facie* case of

---

[15] The Court analyzes Plaintiff's claims under Title VII and the Ohio Civil Rights Act together, as "Ohio's requirements are the same as under federal law." *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo,* 349 F.3d 269, 272 (6th Cir. 2003)); *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 758 n.1 (6th Cir. 2008) ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims."); *see* 42 U.S.C. §§ 2000e-2, 2000e-3; Ohio Rev. Code § 4112.02.

22

unlawful discrimination." *Id.* at 866.  To establish a *prima facie* case of discrimination, a plaintiff must "show that 1) [s]he is a member of a protected class; 2) [s]he was qualified for h[er] job and performed it satisfactorily; 3) despite h[er] qualifications and performance, [s]he suffered an adverse employment action; and 4) that [s]he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside h[er] protected class." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000).  "The *prima facie* requirement for making a Title VII claim 'is not onerous,' . . . and poses 'a burden easily met.'"  *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987)).

In the second stage of the *McDonnell Douglas* framework, the defendant must articulate a legitimate, nondiscriminatory reason for its personnel action.  "The establishment of a *prima facie* case creates a rebuttable presumption of discrimination and requires the defendant to 'articulate some legitimate, nondiscriminatory reason' for taking the challenged action."  *Kroger*, 319 F.3d at 866 (quoting *Univ. of Cincinnati*, 215 F.3d at 573). "If the defendant is able to satisfy this burden, the plaintiff must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'"  *Id.*  A defendant is not required to "persuade the court that it was actually motivated by the proffered reasons.  Rather, it is sufficient for [the defendant] to raise a genuine issue of fact as to whether it discriminated against [the plaintiff].  In order to accomplish this, [the defendant] must clearly set forth, through the introduction of admissible evidence, the reasons for not promoting [the plaintiff]."  *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814-15 (6th Cir. 2011) (internal citations omitted).

23

In the third and final stage of the *McDonnell Douglas* framework, the presumption of discrimination falls away and the burden shifts back to the plaintiff to demonstrate that the employer's proffered reason was a pretext for discrimination.  *Provenzano*, 663 F.3d at 815.  It is up to the plaintiff to "refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'"  *Kroger*, 319 F.3d at 866 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000)).  "[T]he plaintiff retains the ultimate burden of producing "sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him."  *Id.* (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001)).  To carry this burden, "the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action."  *Braithwaite*, 258 F.3d at 494 (citing *Smith v. Chrysler*, 155 F.3d 799, 806-07 (6th Cir.1998)).

The parties dispute whether Plaintiff has met her *prima facie* burden. The Court will assume that Plaintiff has so done for purposes of its analysis.  Assuming *arguendo*, then, that Plaintiff has met her *prima facie* burden, it is incumbent upon Defendants to articulate a "legitimate non-discriminatory reason" for compensating Plaintiff less than her two similarly situated Caucasian colleagues, Megan Mahoney and Natalie Clark.[16]  *Provenzano*, 663 F.3d at 814-15.  Defendants

---

[16] As noted *supra*, Defendants hired Mahoney in 2007 and Clark in 2008.  (Meisse Aff. at ¶¶ 11, 12.)  Mahoney earned $11.54 per hour from 2007 until she left WMFD April 2009.  (*Id.* at ¶ 11.)  Clark earned $10.10 per hour from 2008 until she left WMFD in March 2013.  (*Id.* at ¶ 12.)  Plaintiff earned (1) $9.62 per hour from April 2004 until March 2011; (2)

24

stated that they compensated Plaintiff "according to her experience, education and job duties." (Doc. No. 23 at PageID# 139.) Defendants asserted that, at the time they hired Plaintiff, she had just one prior broadcasting job, no college degree, and job duties that differed from her colleagues. (*Id.*) In Meisse's affidavit, he provided an overview of the differences between Plaintiff's qualifications and job duties, compared to her colleagues' qualifications and job duties. (Doc. No. 23-1.) *See also Provenzano*, 663 F.3d at 815. Defendants have "met [their] burden of production at this second stage of the *McDonnell Douglass* analysis." *Id.*

Because Defendants articulated legitimate, non-discriminatory reasons for compensating Plaintiff less than Mahoney and Clark, the presumption of discrimination is gone and Plaintiff must demonstrate that Defendants' proffered reasons are not the true reasons for the decision to pay her less, but rather pretext for discrimination. *Id.* For the following reasons, the Court finds that Plaintiff fails to carry her burden at the pretext stage and that the Defendants' legitimate, non-discriminatory reasons for Plaintiff's compensation rate are supported by facts that sufficiently justify the modest differences in pay between Plaintiff, Mahoney, and Clark.

First, the Court examines whether Plaintiff's job duties differed from those of Mahoney's and Clark's, as this is where Plaintiff focuses most of her attention. (Doc. No. 28 at PageID# 869-875.) Plaintiff states that WMFD's proffered reason for compensating her less because of her job duties "is a lie." (Doc. No. 28, PageID# 875.) Although Plaintiff never uses the word "pretext" in her Brief in Opposition, this argument appears to fall under the first pretext category, that WMFD's proffered reason lacked a "basis in fact." *See Kroger*, 319 F.3d at 866. Plaintiff not only must establish that

---

$10.58 per hour from March 2011 until December 2015; and (3) $11.10 per hour from January 2016 until her employment was terminated in April 2017. (*Id*. at ¶ 5c, 6, 7.)

WMFD's proffered reason was a pretext, but must also raise material facts sufficient to demonstrate that "discrimination was the real reason" for the adverse employment action. *Univ. of Cincinnati*, 215 F.3d at 573 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In other words, "the pretext question asks only whether there is evidence from which a reasonable jury could conclude that" Defendants did not pay Plaintiff less because of her job duties, "but because of race." *B & S Transportation, Inc. v. Bridgestone Americas Tire Operations, LLC*, 758 F. App'x 503, 507 (6th Cir. 2019) (citing *Univ. of Cincinnati*, 215 F.3d at 573). Plaintiff does not carry this burden.

It is undisputed that Plaintiff's job duties included anchoring multiple newscasts, pulling down and editing national news stories, hosting local news programs, and occasional news specials. (Coles Depo. at Tr. 154-161.) Plaintiff also filled in on weather when needed. (*Id.* at Tr. 66.) It is also undisputed that Plaintiff did not operate her own video camera as part of her position as anchor/reporter. (*Id.* at Tr. 88.) It is undisputed that Mahoney anchored broadcasts and reported news and weather. (Meisse Aff. at ¶ 11.) It is undisputed that Clark also anchored broadcasts, reported news, and assumed weather reporting duties when a weather department position opened. (*Id.* at ¶ 12.) However, the parties dispute the extent to which Mahoney and Clark operated their own video cameras. According to Defendants, Mahoney operated her own video camera from the field. (Meisse Depo. at Tr. 35.) According to Plaintiff, there is a dispute over whether Mahoney, and also Clark, operated video cameras at all.[17] Former reporter and assistant news director Brian Skowronski

---

[17] The parties also hotly dispute whether Plaintiff, Mahoney, and Clark all held the same job title or if Mahoney and Clark were actually "multimedia journalists" (MMJs). In their Reply Brief, Defendants clarify that they never asserted Clark and Mahoney were MMJs, nor that the MMJ role was the sole basis for paying Clark and Mahoney more than Plaintiff. (Doc. No. 31 at PageID# 1327.) However, Meisse testified that both Mahoney and Clark were MMJs, and therefore held different jobs than Plaintiff, an anchor/reporter. (Meisse Depo. at Tr. 29, 35.) Additionally, in a chart Defendants

testified that he shot the video for "every story that [he] worked with [Mahoney] on." (Skowronski Depo. (Doc. No. 28-30) at Tr. 18-19.)  Regarding Clark, Skowronski testified that Clark "never used a camera" and that she, in fact, asked him how to operate a camera before she took a new job at a different news station. (*Id.* at Tr. 18.)

The record indicates that there is basis in fact for Defendants' assertion that Plaintiff, Mahoney, and Clark had some different job duties.  In addition to their similar anchoring and reporting duties, Plaintiff, Mahoney, and Clark also each handled some different facet of television news production.  Plaintiff hosted local affairs shows and never operated a camera. (Coles Depo. at Tr. 88, 154-161.)  Mahoney may have operated her own camera while reporting from the field. (Meisse Depo. at Tr. 35.)  In addition to reporting news, Clark also joined the weather department and regularly reported on weather. (Meisse Aff. at ¶ 12.)  The facts bear out that each employee had modestly different job duties, just as WMFD proffered in the second stage of this analysis.  Further, Plaintiff fails to establish any evidence "from which a reasonable jury could conclude that" WMFD paid Plaintiff less, not because of her job duties, but because of *race*.  *B & S Transportation, Inc.*, 758 Fed. App'x at 507.  Accordingly, Plaintiff has not demonstrated that WMFD's proffered reason regarding the modest differences in job duties between Plaintiff, Mahoney, and Clark did not actually motivate the modest differences in compensation.

Next, the Court examines whether Plaintiff's qualifications differed from those of Mahoney's and Clark's.  "Qualifications evidence is 'relevant to the question of pretext.'"  *Stokes v. Detroit*

---

provided to Plaintiff, Defendants list Mahoney's and Clark's initial positions as MMJs. (Doc. No. 28-2.)  At any rate, Defendants did not assert that they paid Plaintiff less because of her job title, but because of her job duties. (Doc. No. 23 at PageID# 139.)  Upon review of the record, Plaintiff, Mahoney, and Clark shared some similar job duties but also were responsible for separate job duties.

*Public Schools*, 807 Fed. App'x 493, 502 (6th Cir. 2020) (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 626 (6th Cir. 2006)).  Defendants state that they compensated Plaintiff commensurate with her qualifications, including education and experience.  (Doc. No. 23 at PageID# 139.)  Plaintiff fails to address her own qualifications at any point in her Brief in Opposition and also fails to launch any counterargument against Defendants' proffered qualifications reason.  However, upon careful review of the record, the Court notes that Plaintiff pursued—although did not complete—college coursework in sociology at The Ohio State University at Mansfield and in criminal justice at North Central Technical College.  (Doc. No. 24-13; Coles Depo. at Tr. 149-150.)  Plaintiff completed a certificate in television and radio broadcasting at the Ohio Center for Broadcasting in 1995.  (Doc. No. 24-13; Coles Depo. at Tr. 150.)  At the time Plaintiff began working for Defendants in April 2004, she had two years of broadcasting experience, obtained from another local television station in nearby Ashland, Ohio.  (Coles Depo. at Tr. 152-153.)  This means that Plaintiff had approximately five years of broadcasting and reporting experience within the north central Ohio community by the time Mahoney joined WMFD in 2007; Plaintiff had approximately six years of broadcasting experience when Clark joined WMFD in 2008.  (Meisse Aff. at ¶ 11, 12.)

First, the Court compares Plaintiff's qualifications to Mahoney's.  At the time Mahoney was hired, she possessed a college degree.  (Meisse Aff. at ¶ 11b.)  According to Meisse, Mahoney held a college degree in meteorology.  (Meisse Depo. at Tr. 36-37).  While in college, Mahoney also received journalism training.  (*Id.*)  Plaintiff does not address the fact that Mahoney had a college degree or formal journalism training.  Further, Plaintiff alleges that Mahoney was less qualified than she, yet Plaintiff cites to no evidence to substantiate that allegation.  (Doc. No. 28 at PageID# 870.)  When the Court compares Mahoney's education and training to Plaintiff's education and training, as

28

indicated in the record, it is clear that Mahoney had more formal journalism training and education than Plaintiff.  Plaintiff completed a 36-hour certificate in broadcasting, but Mahoney completed a college degree in meteorology, with additional formal journalism training.  Mahoney's educational background surpassed that of Plaintiff's.  Plaintiff may have believed that her previous experience deserved "greater weight" than Mahoney's education, but her belief alone "does not mean [D]efendants are guilty of wage discrimination" because they placed slightly more value on formal education than experience.  *See Woods v. FacilitySource, LLC*, 640 Fed. App'x 478, 484 (6th Cir. 2016).

Next, the Court compares Plaintiff's qualifications against Clark's.  The Court notes that this is a closer call than with respect to Mahoney.  At the time Clark was hired, she possessed a college degree, unlike Plaintiff.  (Meisse Aff. at ¶ 12b.)  Defendants assert on Reply that "Ms. Clark had a broadcasting degree . . . ."  (Doc. No. 31 at PageID# 1327.)  However, according to Clark's LinkedIn profile, Clark holds an associate degree in theater, as well as a certificate in broadcasting from the Ohio Center for Broadcasting.  (Skowronski Depo. Ex. 3.)  Plaintiff holds the same certificate.  (Coles Depo. at Tr. 150.)  Still, Clark completed a degree and Plaintiff did not.  Plaintiff does not address the fact that Clark had a college degree, nor does Plaintiff point to any evidence related to her own training or experience to argue that she held similar formal education or training compared to Clark.

Plaintiff does not even attempt to refute Defendants' proffered qualifications reason; she simply asserts that Clark was less experienced than Plaintiff, yet better compensated.  (Doc. No. 28 at PageID# 870.)  This assertion, without *any* evidence as to pretext, fails to meet the more stringent pretext burden.  Plaintiff "shoulder[s] the burden of 'demonstrat[ing] that the proffered reason was not the true reason for the employment decision.'"  *Cline*, 206 F.3d at 666 (quoting *Burdine*, 450 U.S.

at 255-56, 101 S.Ct. 1089).  Plaintiff fails to do so.  The facts bear out that Clark held a degree and Plaintiff did not.  It may be a modest difference in qualifications, but between Clark and Plaintiff, there was also only a modest difference in pay.  From 2008 through March 2011, Clark earned $10.10 per hour, or fifty cents more, than Plaintiff, who earned $9.62 per hour.  (Meisse Aff. at ¶ 5c, 12.)  In March 2011, Plaintiff received a raise to $10.58 per hour, or forty-eight cents more than Clark.  (*Id.* at ¶ 6, 12.)  Although Plaintiff believes that her time spent at WMFD prior to Clark's arrival merited additional compensation, WMFD's decision to weigh formal education more heavily in its initial compensation decision is not indicative of discrimination.  *See, e.g., Lacey v. Robertson*, 2000 WL 876491 at *3 (6th Cir. 2000) ("An employer's decision to pay more educated employees more money is not discrimination under Title VII.")

Defendants' legitimate, non-discriminatory reasons are sufficiently supported in the record to justify them.  Plaintiff failed to carry her burden to demonstrate that any of Defendants' proffered reasons were pretexts for racial discrimination; therefore, her claims fail.  Accordingly, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's race discrimination claims.

### C.  Retaliation Under Title VII, the ADA, and the Ohio Civil Rights Act Claims

Finally, in Counts One, Two, and Three of the Complaint, Plaintiff alleges that Defendants violated the ADA, Title VII, and state law when they retaliated against her for (1) requesting a disability accommodation, and (2) opposing race discrimination.  (Doc. No. 1 at ¶¶ 68, 79, 95.)

Before addressing the merits of Plaintiff's retaliation claims, the Court must first address the threshold issue of whether Plaintiff exhausted her administrative remedies for her federal and state claims.  Defendants argue that Plaintiff's retaliation claims are barred because she failed to assert any

retaliation claims during the initial EEOC proceeding. (Doc. No. 23 at PageID# 131.) Plaintiff responds that, under the "expected scope of investigation test," she alleged sufficient facts such that a retaliation claim could be "reasonably expected" to grow out of her race and disability discrimination charges. (Doc. No. 28 at PageID# 883.) Defendants respond that this exception is not applicable because Plaintiff specifically admitted that she never (1) brought any documents to the EEOC's attention claiming retaliation, (2) filed a retaliation charge with any agency, or (3) alleged any facts that suggested retaliation occurred. (Doc. No. 31 at PageID# 1324-25.)

### 1. Federal Retaliation Claims

As a prerequisite to bringing claims under Title VII, as well as the ADA, a claimant must first exhaust her administrative remedies. *See Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 470 (6th Cir. 2008); *see also Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 309 (6th Cir. 2000), *cert. denied*, 533 U.S. 951 (2001). "A claimant exhausts his or her administrative remedies by filing a charge with the EEOC." *Maeder v. Hollywood Casino*, 97 F. Supp. 3d 941, 944 (S.D. Ohio 2015). The purpose of this exhaustion requirement "is to trigger an investigation, which gives notice to the alleged wrongdoer of its potential liability and enables the EEOC to initiate conciliation procedures in an attempt to avoid litigation." *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

However, because "aggrieved parties"—not attorneys—often file EEOC charges, "their *pro se* complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 362 (6th Cir. 2010) (citing *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 732 (6th Cir. 2006)). "As a result, 'whe[n] facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from

bringing suit on that claim.'"  *Id.* (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir.1998)). Therefore, "the judicial complaint must be limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination."  *Id.* (quoting *Weigel v. Baptist Hosp. of East Tennessee*, 302 F.3d 367, 380 (6th Cir. 2002)).

Under this "expected scope of investigation test," "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Id.* (quoting *Weigel*, 302 F.3d at 380).  Generally, "retaliation claims based on conduct that occurred *before* the filing of the EEOC charge must be included in that charge."  *Strouss v. Michigan Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 547 (6th Cir.1991) (abrogated on other grounds)) ("Retaliatory conduct occurring prior to the filing of the EEOC complaint is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint.").  If the retaliatory conduct took place before the filing of the EEOC charge, and the plaintiff failed to allege retaliation in her EEOC Complaint, the retaliation must pass the "expected scope of investigation" test for the court to have jurisdiction over such a claim.  *Weigel*, 302 F.3d at 380 (*quoting EEOC v. Bailey Co.*, 563 F.2d 439, 446 (6th Cir.1977)).

Here, the Court finds that Plaintiff failed to exhaust her administrative remedies with respect to her ADA and Title VII retaliation claims because she did not allege sufficient facts in her EEOC Complaint to put the EEOC on notice of her retaliation claims.  In its entirety, Plaintiff's EEOC Complaint states as follows:

> I was hired by the Respondent in April 2004.  My most recent position was Anchor/Reporter.  I was terminated on April 30, 2017.

> I know that Respondent paid white Anchor/Reporters that were hired after me more money.  I complained about the pay difference and to my knowledge no investigation was conducted.
>
> I requested a reasonable accommodation on April 12, 2017, and Respondent denied my accommodation request and terminated my employment.
>
> I believe I was discriminated against when I was paid less money because of my race, African American, in violation of Title VII of the Civil Rights Act of 1964, as amended, and denied a reasonable accommodation because of my disability, in violation of Title I of the Americans with Disabilities Act of 1990, as amended, (ADA) [*sic*].

(Doc. No. 24-11.)

Plaintiff failed to include any facts in the narrative portion of her EEOC claim that could be interpreted as claiming retaliation.  Compare Plaintiff's bare-bones complaint to the more fulsome complaint in *Dixon v. Ashcroft*, 392 F.3d 212.  In *Dixon*, the plaintiff alleged that an ex-supervisor "discriminated against [him], causing the Bureau to do the same, because of Race, fictious information he received from two other agents, *and because the Applicant Program was removed from his direct supervision because of harassment*."  *Id.*, at 217-18 (emphasis in original).  The *Dixon* court held that "[t]he determinative inquiry in this case, therefore, is whether Dixon alleged sufficient facts in his EEOC Complaint to put the EEOC on notice of his retaliation claim."  *Id.* at 217.  The court determined that Dixon—who filed his EEOC Complaint without assistance of counsel—alleged sufficient facts from the course of his ten-year employment (including how his immediate supervisor allegedly lost responsibility for a particular program following the plaintiff's complaint of discrimination) to put the EEOC on notice of his retaliation claim.  *Id.* at 216, 218.

By contrast, here, Plaintiff did not include any facts in her charge that might have caused the EEOC to be on notice of a possible retaliation claim.  Indeed, Plaintiff alleges that she complained

33

about racial disparities in pay but does not allege whether Defendants took *any* action with respect to her complaint, let alone a retaliatory one.  Further, Plaintiff's allegation that Defendants denied a reasonable accommodation request and terminated her employment does not rise to level of detail that this court held sufficient in *Dixon*.  Plaintiff checked the "Disability Discrimination" box on the EEOC cover sheet and set forth her disability discrimination claim in a single sentence.  Even liberally construing Plaintiff's *pro se* EEOC charge, Plaintiff does not allege sufficient facts that would put the EEOC on notice of a separate retaliation claim as the *Dixon* plaintiff did.

Therefore, the Court grants Defendants' Motion for Summary Judgment with respect to Plaintiff's ADA and Title VII retaliation claims in Counts One and Three on the grounds that they are barred for failure to exhaust administrative remedies.

## 2.  State Retaliation Claims

The Court notes—although both parties fail to address it—that, under the Ohio Civil Rights Act, "a discrimination claimant may pursue a civil cause of action without first exhausting his administrative remedies." *Harrison v. City of Akron*, 43 F. App'x 903, 905 (6th Cir. 2002) (citing Ohio Rev. Code § 4112.99); *see also Carney v. Cleveland Heights–Univ. Heights City Sch. Dist.*, 758 N.E.2d 234, 243 (Ohio App. 8th Dist. 2001) (plaintiff did not need to exhaust administrative remedies prior to pursuing retaliation discrimination claim).  In Count Two of her Complaint, Plaintiff alleges that she was retaliated against for requesting a reasonable accommodation, in violation of the Ohio Rev. Code §§ 4112.01, *et seq.*  (Doc. No. 1 at ¶ 79.)

To establish a disability retaliation claim under the Ohio Rev. Code § 4112.02(I), a plaintiff must establish "that (1) [s]he engaged in protected activity; (2) h[er] employer knew about the protected activity; (3) the employer took an adverse action; and (4) there was a causal connection

between the protected activity and the adverse action." *Pflanz v. Cincinnati*, 778 N.E.2d 1073, 1089-90 (Ohio App. 1st Dist. 2002). If the plaintiff establishes a *prima facie* case, "the burden then shift[s] to the [employer] to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.*

However, as discussed in great detail above, this Court found that Plaintiff failed to request an accommodation. (*See supra*.) Because Plaintiff's retaliation claim is premised on an alleged accommodation request that Plaintiff never made, Plaintiff's state law disability retaliation claim fails.

Further, even if this Court liberally construed Plaintiff's Complaint to include a state law race-based retaliation claim, such a claim fails for at least two reasons. First, Plaintiff failed to engage in activity protected by Title VII. *See, e.g., Brown v. O'Reilly Automotive Stores, Inc.*, 54 N.E.3d 638, 647 (Ohio App. 8th Dist. 2015) (quoting *Coch v. GEM Indus.*, 2005 WL 1414454 at *5 (Ohio App. 6th Dist. 2005) ("Vague charges of discrimination do not invoke the protections of the law."); *see also Weltman v. Panetta*, No. 1:11CV 1229, 2012 WL 4955286, at *5 (N.D. Ohio Oct. 16, 2012) (quoting *Fox v. Eagle Distributing Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007)). Second, Plaintiff did not identify any evidence that would support an inference of causation. *See, e.g., Putney v. Contract Bldg. Components*, 2009 WL 4894811 at *12 (Ohio App. 3d Dist. 2009) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) ("[A] plaintiff must proffer evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action.") To the contrary, a full seven years passed between the time Plaintiff allegedly complained about her pay disparity and when Defendants terminated her employment. In the intervening seven years, Plaintiff received two pay raises and was approached about applying for a

promotion.  (Meisse Aff. at ¶¶ 6-8.)  Under these circumstances, the Court finds that Plaintiff has failed to meet the fourth element of her *prima facie* race-based retaliation claim; i.e., that there is a causal connection between her alleged protected activity and her termination.

Accordingly, for all the reasons set forth above, Defendants are entitled to judgment in their favor with respect to Plaintiffs' federal and state retaliation claims.

**V.     Defendants' Motion for Summary Judgment on Lost Wages, Benefits, and Punitive Damages**

Defendants also move for summary judgment on Plaintiff's prayer for lost wages, lost benefits, and punitive damages.  (Doc. No. 23 at PageID# 143-144.)  Because the Court grants summary judgment in favor of Defendants with respect to all of Plaintiff's claims, the Court need not address Defendant's arguments with respect to Plaintiff's requests for lost wages, lost benefits, and punitive damages.

**VI.     Conclusion**

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 23) is GRANTED.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  August 18, 2020                        U. S. DISTRICT JUDGE

36